IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
**Judge Philip A. Brimmer**

Civil Action No. 12-cv-00300-PAB-KMT

LESLIE TAYLOR,
CAROLINE NICHOLE COOKE,
JACOB COOKE, and
COLORADO CROSS-DISABILITY COALITION, a Colorado nonprofit organization,

    Plaintiffs,

v.

COLORADO DEPARTMENT OF HEALTH CARE POLICY AND FINANCING and
SUE BIRCH, in her official capacity as Executive Director of the Colorado Department of Health Care Policy and Financing,

    Defendants.

---

# ORDER

---

This matter is before the Court on The State's Rule 12(b)(1) and Rule 12(b)(6) Motion to Dismiss Plaintiffs' First Amended Complaint [Docket No. 29] filed by defendants Colorado Department of Health Care Policy and Financing ("DHCPF") and Sue Birch, in her official capacity as Executive Director of the DHCPF. The Court's jurisdiction is based on 28 U.S.C. § 1331.

## I. BACKGROUND

Plaintiffs allege the following in their amended complaint [Docket No. 22]: Plaintiff Leslie Taylor is a resident of Cahone, Colorado. Docket No. 22 at 5, ¶ 31. Ms. Taylor is disabled and is eligible for Medicaid. *Id*. at 3, ¶¶ 14-15, 17. She requires a wheelchair and has a visual impairment that prevents her from driving. *Id*. ¶¶ 14-15. She also requires an attendant to accompany her when she leaves her home. *Id*. at 5,

¶ 35.

Defendant DHCPF administers Colorado's Medicaid program. *Id*. at 4, ¶ 27; *see* 42 U.S.C. § 1396, *et seq*. Ms. Taylor receives Medicaid-funded home health care through the Colorado Consumer Directed Attendant Support Services ("CDASS") program. *Id*. at 6, ¶¶ 53-54. CDASS pays an hourly wage to Ms. Taylor's two attendants, Nichole and Jacob Cooke, for the time they spend performing covered personal care services for Ms. Taylor. *Id*. at 6-7, ¶¶ 52, 60; *see* 10 Colo. Code Regs. § 2505-10:8.489. Pursuant to its policies, CDASS does not pay an hourly wage, or any other form of payment, to Ms. Taylor's attendants for the time they spend driving her to medical appointments.[1] Docket No. 22 at 7, 17 at ¶¶ 60, 131; *see* 10 Colo. Code Regs. § 2505-10:8.489.30(Q).

Beginning in January 2009, Ms. Taylor's medical needs required her to travel to Cortez, Durango, and Dolores, Colorado, and Farmington, New Mexico for non-emergency but medically necessary appointments. *Id*. at 5, ¶ 42. These appointments were between 26 and 94 miles from her home. *Id*. at 6, ¶¶ 44-47. Ms. Taylor owns a car in which she can be driven to appointments, but she does not have friends or family who can drive her. *Id*. at 6, ¶¶ 48-49. Since 2009, her attendants have driven her to her non-emergency medical appointments. *Id*. at 10, ¶¶ 85-89.

As part of its Medicaid program, DHCPF offers a Non-Emergency Medical Transportation ("NEMT") service, which provides transportation to and from medically

---

[1] CDASS policies do provide for hourly payment to personal attendants for time spent accompanying clients to medical appointments "when a personal care provider is needed during the trip to provide one or more other unskilled personal care services listed in this Section." 10 Colo. Code Regs. § 2505-10:8.489.30(Q).

necessary appointments to Medicaid recipients who, like Ms. Taylor, do not have other means of transportation. Docket No. 22 at 4, ¶ 28. In more populated counties, NEMT contracts with a broker to provide transportation services. *Id*. at 5, ¶ 37. In less populated counties, NEMT reimburses eligible individuals, according to a fee schedule, for each mile traveled to and from non-emergency medical appointments. *Id*. at 11-12, ¶¶ 97-98. The NEMT program does not fund a wheelchair-accessible brokered transportation service in Ms. Taylor's area for which she is eligible.[2] *Id*. at 5, 8 ¶¶ 36, 67-72. At all relevant times, the reimbursement rate was $.37, $.38, or $.39 per mile. *Id*. at 13, ¶ 109. Ms. Taylor lives on a fixed income and the mileage reimbursement rate is not sufficient for her to pay for gas, maintenance, car insurance, and pay her attendants the minimum wage for the time they spend transporting her to appointments. *Id*. at 15, ¶ 123. Plaintiffs allege, without further explanation, that Ms. Taylor's attendants "will not continue to drive Ms. Taylor to her non-emergent medical appointments without just hourly compensation." *Id*. at 20, ¶ 147.

In February 2009, Ms. Taylor requested that defendants pay her attendants, either directly or through CDASS, for time spent driving. *Id*. at 8-9, ¶ 80. Defendants denied her request to pay her attendants through the CDASS program. *Id*. at 12, 14 ¶¶ 101, 118. On December 23, 2009, Dolores County, where Ms. Taylor resides, issued her a check in the amount of $1,107.00 for "Med Trans - Attendants," with no additional documentation. *Id*. at 12, ¶¶ 102-03. However, on January 18, 2010, Ms.

---

[2] The sole wheelchair-accessible brokered NEMT service in Dolores County is available only to individuals over the age of 60, which excludes Ms. Taylor, who is younger. Docket No. 22 at 8, ¶¶ 68-71.

Taylor returned the check because the amount was unsubstantiated, there were no instructions regarding tax treatment, and it was made out to Ms. Taylor, as opposed to her attendants. *Id*. at 13, ¶ 107.

On February 3, 2012, plaintiffs brought this case, alleging violations of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, and the Rehabilitation Act, 29 U.S.C. § 794.[3]  Specifically, plaintiffs allege that defendants' NEMT policy discriminates against Ms. Taylor by reason of her disability because the reimbursement covers the full cost of transportation for non-disabled individuals but does not cover the cost of her attendants. Docket No. 22 at 19, ¶ 135.  They also allege that the NEMT policy is discriminatory on its face because it "prohibits individuals with disabilities who need attendants to drive them to medical appointments from paying the attendants a reasonable wage, and requires them to manage payment of the attendants . . . when all other NEMT clients get all services." *Id*. at 19, ¶ 136.  Plaintiffs claim that defendants' conduct has harmed plaintiffs Mr. and Ms. Cooke because they have been denied fair compensation for time spent traveling with Ms. Taylor, *Id*. at 20, 24, ¶¶ 145-46, 174-75,

---

[3] The procedural history is somewhat unclear from the complaint. Defendants allege, and plaintiffs do not deny, that the case unfolded as follows: "In July 2009, Taylor filed an administrative appeal with the Colorado Office of Administrative Courts seeking to compel the Department to pay her caregivers an hourly wage for traveling to and from appointments. She prevailed in front of an Administrative Law Judge, but this determination was overturned by [DHCPF] in a final agency decision. Taylor then proceeded to state court in a lawsuit seeking judicial review of that decision, and asserting ADA and § 1983 claims. The court bifurcated the judicial review issue from the remaining claims and determined that [DHCPF] was not violating applicable statutes and regulations by refusing to pay attendants an hourly wage for travel time on top of the mileage reimbursements. Before the state court could address her other claims, Taylor and [DHCPF] agreed to dismiss her lawsuit without prejudice." Docket No. 29 at 2-3.

and harmed plaintiff Colorado Cross-Disability Coalition ("CCDC") because the organization has expended time and resources on this matter and because defendants' conduct frustrates CCDC's purposes as an organization. *Id*. at 21-22, ¶¶ 151-60.

Plaintiffs seek (1) a declaration that defendant Sue Birch, in her official capacity as Executive Director of DHCPF, is in violation of Title II of the ADA; (2) a declaration that DHCPF is in violation of § 794(a) of the Rehabilitation Act; (3) an injunction ordering defendants to modify the NEMT or CDASS programs so that attendants may be reimbursed for driving Medicaid recipients to medical appointments; (4) damages against DHCPF; and (5) attorney's fees and costs. Docket No. 22 at 27-28, ¶¶ 1-7.

On June 1, 2012, defendants filed a motion to dismiss for lack of subject matter jurisdiction and failure to state a claim. Docket No. 29.

## II. STANDARD OF REVIEW

Dismissal pursuant to Federal Rule of Civil Procedure 12(b)(1) is appropriate if the Court lacks subject matter jurisdiction over claims for relief asserted in the complaint. Rule 12(b)(1) challenges are generally presented in one of two forms: "[t]he moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Merrill Lynch Bus. Fin. Servs., Inc. v. Nudell*, 363 F.3d 1072, 1074 (10th Cir. 2004) (quoting *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003)). When resolving a facial attack on the allegations of subject matter jurisdiction, the Court "must accept the allegations in the complaint as true." *Holt v. United States*, 46 F.3d

1000, 1002 (10th Cir. 1995). To the extent the defendant attacks the factual basis for subject matter jurisdiction, the Court "may not presume the truthfulness of the factual allegations in the complaint, but may consider evidence to resolve disputed jurisdictional facts." *SK Finance SA v. La Plata Cnty.*, 126 F.3d 1272, 1275 (10th Cir. 1997). "Reference to evidence outside the pleadings does not convert the motion to dismiss into a motion for summary judgment in such circumstances." *Id*. Ultimately, and in either case, plaintiff has "[t]he burden of establishing subject matter jurisdiction" because it is "the party asserting jurisdiction." *Port City Props. v. Union Pac. R.R. Co.*, 518 F.3d 1186, 1189 (10th Cir. 2008).

The Court's function on a Rule 12(b)(6) motion for failure to state a claim upon which relief may be granted is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim. FED. R. CIV. P. 12(b)(6); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (citations omitted). In doing so, the Court "must accept all the well-pleaded allegations of the complaint as true and must construe them in the light most favorable to the plaintiff." *Alvarado v. KOB-TV, LLC*, 493 F.3d 1210, 1215 (10th Cir. 2007) (quotation marks and citation omitted). At the same time, however, a court need not accept conclusory allegations. *Moffett v. Halliburton Energy Servs., Inc.*, 291 F.3d 1227, 1232 (10th Cir. 2002).

Generally, "[s]pecific facts are not necessary; the statement need only 'give the defendant fair notice of what the claim is and the grounds upon which it rests.'" *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (per curiam) (quoting *Bell Atlantic Corp. v.*

*Twombly,* 550 U.S. 544, 555 (2007)).  The "plausibility" standard requires that relief must plausibly follow from the facts alleged, not that the facts themselves be plausible.  *Bryson v. Gonzales*, 534 F.3d 1282, 1286 (10th Cir. 2008).  However, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (internal quotation marks and alteration marks omitted).  Thus, even though modern rules of pleading are somewhat forgiving, "a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory."  *Bryson*, 534 F.3d at 1286 (quotation marks and citation omitted).

### III.  DISCUSSION

#### A.  Sovereign Immunity

Defendants argue that the Eleventh Amendment bars plaintiffs' claims under the Rehabilitation Act because accepting federal funds is not sufficient to waive sovereign immunity.  Docket No. 29 at 7-9.  Defendants admit that they receive federal funding.  *Id*.

As defendants acknowledge, the Tenth Circuit has held that "[a]n affirmative choice to apply for, and accept, [federal] funds . . . serves as an express waiver of immunity" to Rehabilitation Act claims.  *Brockman v. Wyo. Dep't of Family Servs.*, 342 F.3d 1159, 1168 (10th Cir. 2003); *see* 42 U.S.C. § 2000d, d-4a(1)(A), d-7(a)(1) (a state department or agency that receives federal financial assistance "shall not be immune under the Eleventh Amendment of the Constitution of the United States from suit in

Federal court for a violation of section 504 of the Rehabilitation Act of 1973"). In support of their position, defendants offer the minority viewpoint, as stated in a Second Circuit case, *Garcia v. S.U.N.Y. Health Sci. Ctr.*, 280 F.3d 98, 113-14 (2d Cir. 2001), which held that accepting federal funds does not necessarily waive sovereign immunity to Rehabilitation Act claims. Defendants also cite dicta from the Supreme Court's opinion in *Sossamon v. Texas*, 131 S. Ct. 1651, 1662 (2011) ("Even assuming that a residual clause . . . could constitute an unequivocal textual waiver . . . .").

The Court declines to depart from settled Tenth Circuit precedent and holds that, by accepting federal funding, defendants waived immunity to plaintiffs' Rehabilitation Act claims.

### B.  **Discrimination by Reason of Disability**

Plaintiffs allege that defendants have violated and continue to violate the ADA and the Rehabilitation Act because they will not pay Ms. Taylor's personal attendants for time spent driving her to and from necessary medical appointments. Docket No. 22 at 27. A single set of standards is used to determine whether action is discriminatory under both the ADA and the Rehabilitation Act and thus the Court considers these claims together. *See Wilkerson v. Shinseki*, 606 F.3d 1256, 1262 (10th Cir. 2010).

Title II of the ADA states that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. To state a claim for discrimination under the ADA, the plaintiff must allege that "(1) that he [or she] is a qualified individual with a

disability; (2) that he [or she] was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities, or was otherwise discriminated against by the public entity; and (3) that such exclusion, denial of benefits, or discrimination was by reason of the plaintiff's disability." *Gohier v. Enright*, 186 F.3d 1216, 1219 (10th Cir. 1999).

A claim under the Rehabilitation Act must meet similar requirements, namely, "(1) that the plaintiff is disabled under the Act; (2) that [s]he would be 'otherwise qualified' to participate in the program; (3) that the program receives federal financial assistance (or is a federal agency); and (4) that the program has discriminated against the plaintiff." *McGeshick v. Principi*, 357 F.3d 1146, 1150 (10th Cir. 2004).

There is no dispute that Ms. Taylor is a qualified individual with a disability, that she is "otherwise qualified" for the CDASS and NEMT programs, and that defendants receive federal funding. At issue is whether defendants' policy is discriminatory. Docket No. 29 at 4-5.

Under the Rehabilitation Act, "an otherwise qualified handicapped individual must be provided with meaningful access" to Medicaid benefits. *Alexander v. Choate*, 469 U.S. 287, 301 (1985). A "benefit" is defined "by reference to a plaintiff's facial legal entitlements." *Henrietta D. v. Bloomberg*, 331 F.3d 261, 277 (2d Cir. 2003). Although the Supreme Court has not categorically excluded the possibility that the Rehabilitation Act recognizes disparate impact claims, *Choate*, 469 U.S. at 299, "[a] facially neutral governmental restriction does not deny 'meaningful access' to the disabled simply because disabled persons are more likely to be affected by it." *Patton v. TIC United*

*Corp.*, 77 F.3d 1235, 1246 (10th Cir. 1996).

In *Choate*, the Supreme Court considered a challenge under the Rehabilitation Act to Tennessee's imposition of a fourteen-day annual limit on Medicaid coverage of inpatient care. 469 U.S. 287. The Court held that the policy did not violate the Rehabilitation Act because it did not apply criteria that screened out individuals with disabilities, did not facially distinguish between individuals with and without disabilities, and did not deny the disabled "meaningful access" to the benefit at issue, namely, fourteen days of inpatient care. *Id*. at 302. The Court held that Medicaid does not guarantee a substantive outcome, such as "adequate health care," to every recipient but rather "a particular package of health care services." *Id*. at 303. The Court further held that states need not conform their policies to "meet the reality that the handicapped have greater medical needs" as Medicaid does not "guarantee the handicapped equal results." *Id*. at 303-04. *See also Charleston Memorial Hosp. v. Conrad*, 693 F.2d 324, 330 (4th Cir. 1982) ("A service is 'sufficient in amount, duration, and scope' under 42 C.F.R. § 440.230(b) if it is adequate to service the needs of most of the individuals eligible for Medicaid assistance.") (internal citations omitted).

In *Cohon ex rel. Bass v. New Mexico Dep't of Health*, 646 F.3d 717 (10th Cir. 2011), the court held that a cap on funds available through a Medicaid program providing home-based care did not violate the ADA or Rehabilitation Act. The challenged program was the Mi Via Waiver program, which "is intended to provide a community-based alternative to institutional care that allows an eligible recipient to have control over services and supports." N.M. Code R. § 8.314.6.9(A) (2006). Participants

receive an individual budget to spend on their chosen home health care providers. *Id*. at 721. Individual budgets are "calculated based on algorithms developed by the state for recipients of the same waiver population . . . with similar characteristics as the [M]i [V]ia participant." *Id*. (quoting N.M. Code. R. § 8.314.6.17(B)(2) (internal quotation marks omitted). The program allots $59,449 annually to participants who are developmentally disabled, require residential support, and are over the age of 21. *Id*. However, a participant may receive a greater allotment by showing a chronic physical condition, chronic cognitive difficulties, a change in health status, or a change in natural supports. *Id*.

The plaintiff in *Cohon*, who was blind and suffered from cerebral palsy and autism, proposed a budget of $106,667, which was approved in the amount of $97,007. *Id*. The $9,660 in the proposed budget that Mi Via would not fund was allocated to "chiropractic and orthotic services, nutritional supplements, fleet enemas, ski lessons, swim punch cards, funds to attend non-local conferences and meetings (including registration, hotel, and a per diem), four DVDs, overnight care, care buddy merit increases, driver merit increases, community job advisor raises, and money in a reserve fund." *Id*. These expenses met program standards and would have been approved had plaintiff not already exceeded the $59,449 allotment. *Id*. at 721-22. Following plaintiff's administrative appeal, the director of the state's Medicaid division determined that, "because the additional budget requests exceeded the Mi Via budgetary allotment, they had to be necessary to 'keep the participant safe' in order to be approved." *Id*. at 722. Plaintiff sued, alleging that defendants violated the ADA and the Rehabilitation Act

by subjecting her budget requests to an extra requirement that did not apply to less severely disabled participants. *Id*. at 722. She argued, in part, that the budget cap precluded her from realizing the program's goals of self-direction and self-determination. *Id*. at 725.

The Tenth Circuit held that the benefit provided by the Mi Via Waiver program was the $59,449 budget allotment and that plaintiff had not been denied meaningful access to this allotment. *Id*. at 726. It explained that the "state cannot provide 'self-direction'; it can only provide an allocation or package of services or compensation in the hope that participants can achieve those goals using the program's provided 'benefits.'" *Id*. at 727. Accordingly, the court held that plaintiff did "not have a legal entitlement to the services she requests; her budget requests are eligible for approval but they are also subject to the [budget] limitation." *Id*. at 729. The court stressed that Medicaid does not guarantee equal results to all participants and cited *Choate* for the proposition that coverage limitations are permissible, even if the coverage, as limited, does not fully meet the needs of disabled recipients. *Id*. at 727 (internal citation omitted). *See also Rodriguez v. City of New York*, 197 F.3d 611, 618 (2d Cir. 1999) ("The ADA requires only that a particular service provided to some not be denied to disabled people. . . . Thus, New York cannot have unlawfully discriminated against appellees by denying a benefit that it provides to no one."); *Modderno v. King*, 82 F.3d 1059, 1066 (D.C. Cir. 1996) (Ginsburg, J., concurring) ("Unless some coverage is denied to persons who currently have a disabling condition while at the same time granted to those who do not currently have a disabling condition, or denied to persons

with a particular disability but not to persons with a different disability, there is no discrimination on account of disability. Equal coverage for all is non-discriminatory.").

Defendants argue that plaintiffs fail to state a claim since they do not allege that Ms. Taylor has been denied access to a benefit. Docket No. 29 at 18. They further argue that limiting Medicaid services is not discriminatory simply because the services offered are inadequate to meet the needs of certain recipients. *Id*.

As an initial matter, a plaintiff need not allege a complete denial of access to a particular service in order to state a claim under the Rehabilitation Act. It is sufficient to allege that a public entity has discriminated in some way in the provision of its services. *See* 42 U.S.C. § 12132 ("no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, *or be subjected to discrimination by any such entity*.") (emphasis added); 29 U.S.C. § 794(a) (stating that no one "shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, *or be subjected to discrimination* under any program or activity receiving Federal financial assistance.") (emphasis added); *Gohier*, 186 F.3d at 1220 ("the problem with the magistrate's approach is that it ignored the second basis for a Title II claim. As noted above, Title II commands that [plaintiff] not 'be excluded from participation in or be denied the benefits of the services, programs, or activities of [Colorado Springs], *or* be subjected to discrimination by [Colorado Springs].'") (emphasis in original). Following *Choate*, discrimination constitutes the denial of "meaningful access" to a benefit offered by a public entity. 469 U.S. at 301. Thus, the

question before the Court is whether plaintiffs' complaint alleges that defendants' policies deny denied meaningful access to the offered benefit.

Resolving this question requires the Court to determine what benefit DHCPF is offering through NEMT and CDASS. Colorado's Medicaid Plan provides that:

> The state-designated entity shall assure that necessary NEMT services covered by the Colorado Medical Assistance program for clients who have no other means of transportation are provided. . . . Payment will be made for the least expensive transportation suitable to the client's condition. The distance to be traveled, transportation methods available, treatment facilities available, and the physical condition and welfare of the client shall all determine the type of NEMT authorized. The type of transportation available may vary by region because of rural and urban conditions.
>
> . . .
>
> Reimbursement for non-brokered NEMT shall be the lower of submitted charges or fee schedule rate as determined by the Department of Health Care Policy and Financing. Brokered NEMT, which is used only in non-emergency circumstances, shall be reimbursed through negotiated contracts based on fee-for-service rates and expenditures.

STATE PLAN UNDER TITLE XIX OF THE SOCIAL SECURITY ACT MEDICAL ASSISTANCE PROGRAM, METHODS OF ASSURING TRANSPORTATION (2009), *available at* http://www.colorado.gov/cs/Satellite/HCPF/HCPF/1223548942896.

The NEMT plan, therefore, establishes transportation as a benefit and specifies a method for providing it, namely, through brokered services and mileage reimbursements. The plan makes clear that the types of services offered may vary by location and that mileage reimbursements will be allotted according to a fixed fee schedule. The plan thus defines the transportation benefit, for residents living in rural areas, as a monetary allotment, akin to that at issue in *Cohon*. Monetary allotments–like benefits measured in time, *see Choate*, 469 U.S. 287–may be limited so

long as that limitation applies to all recipients, regardless of whether or not they are disabled. *See Cohon*, 646 F.3d 717. In keeping with this requirement, the benefit here is provided to all recipients living in rural areas at the same rate, regardless of disability. *See Modderno*, 82 F.3d at 1066.

Likewise, the CDASS policy provides coverage for "unskilled personal care," which is explicitly defined to include only certain activities. 10 Colo. Code Regs. § 2505-10:8.489.20. The policy clearly states that accompanying a client on errands is covered to the extent that personal care services are necessary, but that transporting the client without providing other forms of care is not covered. *Id*. at § 2505-10:8.489.30(Q). Thus, the benefit offered by CDASS is a paid attendant to care for a client in the client's home, where what constitutes "care" is explicitly limited to certain services. *See id*. at § 2505-10.489.10.11 ("Personal care services means services which are furnished to an eligible client in the client's home to meet the client's physical, maintenance and supportive needs, when those services are not skilled personal care as described in the EXCLUSIONS section below, do not require the supervision of a nurse, and do not require physician's orders.").

Ms. Taylor does not allege that non-disabled recipients are entitled to, or are provided with, mileage reimbursements or personal care that she has been unable to obtain. Rather, she alleges that the mileage reimbursement and the personal care services to which all recipients are entitled is insufficient to cover her particular medical needs. *See* Docket No. 22 at 15, ¶ 123 ("Plaintiff Taylor lives on a fixed income and cannot afford to pay her attendants for the time spent driving and for gas, wear-and-tear on her vehicle, maintenance and insurance for this amount."); Docket No. 22 at 20,

¶ 143 ("Plaintiff Taylor cannot afford to pay her attendants their hourly wages for their time driving her to non-emergent medical appointments."). Nor does Ms. Taylor allege that she has been denied the full amount of the mileage reimbursement to which she is entitled under the NEMT or CDASS policies. States have discretion to limit Medicaid services even when doing so deprives certain recipients of adequate care. *See Cohon*, 646 F.3d at 727. Accordingly, defendants' facially neutral restrictions do not "deny 'meaningful access' to the disabled simply because disabled persons are more likely to be affected by it." *Patton v. TIC United Corp.*, 77 F.3d 1235, 1246 (10th Cir. 1996).

As defendants' policy does not deny meaningful access to the offered benefits, plaintiffs fail to state a claim upon which relief can be granted.

### C. Failure to Accommodate

Plaintiffs allege that modifying the NEMT or CDASS policies would be a reasonable accommodation and is thus required under the ADA and the Rehabilitation Act. Docket No. 22 at 23-24, ¶¶ 165-172.

The ADA provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

"A modification is 'necessary' only when it allows the disabled to obtain benefits that they ordinarily could not have by reason of their disabilities, and not because of some quality that they share with the public generally." *Wisc. Community Servs., Inc. v.*

¶ 143 ("Plaintiff Taylor cannot afford to pay her attendants their hourly wages for their time driving her to non-emergent medical appointments."). Nor does Ms. Taylor allege that she has been denied the full amount of the mileage reimbursement to which she is entitled under the NEMT or CDASS policies. States have discretion to limit Medicaid services even when doing so deprives certain recipients of adequate care. *See Cohon*, 646 F.3d at 727. Accordingly, defendants' facially neutral restrictions do not "deny 'meaningful access' to the disabled simply because disabled persons are more likely to be affected by it." *Patton v. TIC United Corp.*, 77 F.3d 1235, 1246 (10th Cir. 1996).

As defendants' policy does not deny meaningful access to the offered benefits, plaintiffs fail to state a claim upon which relief can be granted.

### C. Failure to Accommodate

Plaintiffs allege that modifying the NEMT or CDASS policies would be a reasonable accommodation and is thus required under the ADA and the Rehabilitation Act. Docket No. 22 at 23-24, ¶¶ 165-172.

The ADA provides that "[a] public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7).

"A modification is 'necessary' only when it allows the disabled to obtain benefits that they ordinarily could not have by reason of their disabilities, and not because of some quality that they share with the public generally." *Wisc. Community Servs., Inc. v.*

*City of Milwaukee*, 465 F.3d 737, 754 (7th Cir. 2006). Accordingly, this "element is satisfied only when the plaintiff shows that, 'but for' his disability, he would have been able to access the services or benefits desired." *Id*.

As discussed above, plaintiffs do not allege that the benefit they seek–hourly compensation for the time that Ms. Taylor's personal attendants spend driving her to medical appointments–would be available if Ms. Taylor were not disabled. There is no dispute that such a benefit is unavailable regardless of disability status and thus no argument that, but for Ms. Taylor's disability, she would have access to the "services or benefits desired." *See id*.

As plaintiffs' allegations are insufficient to meet the necessity element, they fail to state a claim for failure to accommodate.

## IV. CONCLUSION

For the foregoing reasons, it is

**ORDERED** that The State's Rule 12(b)(1) and Rule 12(b)(6) Motion to Dismiss Plaintiffs' First Amended Complaint [Docket No. 29] is GRANTED. It is further

**ORDERED** that the case is DISMISSED.

DATED February 25, 2013.

BY THE COURT:

s/Philip A. Brimmer
PHILIP A. BRIMMER
United States District Judge